IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 5, 2003

## STATE OF TENNESSEE v. CLIFFORD JAMES ENGUM

Direct Appeal from the Criminal Court for Madison County
No. 00-586     Donald H. Allen, Judge

No. W2002-01124-CCA-R3-CD  - Filed February 4, 2004

The appellant, Clifford James Engum, pled guilty in the Madison County Criminal Court to vehicular homicide by recklessness and aggravated assault with a deadly weapon, to-wit: a motor vehicle.  Pursuant to the plea agreement, the appellant received a total effective sentence of eight years incarceration in the Tennessee Department of Correction.  The trial court ordered the appellant to serve one year of his sentence in confinement and the remainder of his sentence on probation.  On appeal, the appellant contests the trial court's denial of full probation and the eight-year suspension of his driver's license.  Upon review of the record and the parties' briefs, we remand to the trial court for correction of the judgment of conviction for vehicular homicide to reflect that the appellant's driving privileges in the state of Tennessee are revoked for a period of eight years.  The judgments of the trial court are affirmed in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed and Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Helen M. Donnelly, Knoxville, Tennessee (at trial and on appeal) and Patrick B. Moore, Atlanta, Georgia (at trial), for the appellant, Clifford James Engum.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Alfred L. Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

On February 27, 2002, the appellant pled guilty in the Madison County Criminal Court to the vehicular homicide of Tennessee State Trooper Lynn M. Ross and the aggravated assault of Margaret Jordan. At the guilty plea hearing, the State recited the following factual basis for the pleas:

> [O]n or about the 26th day of July of the year 2000 the [appellant] did unlawfully and recklessly kill Trooper Lynn M. Ross by operation of a motor vehicle, that being a tractor trailer by the proximate result of [the appellant's] conduct creating a substantial risk of death or serious bodily injury here in Madison County.
>
> Also, pursuant to that reckless conduct . . . a lady by the name of Margaret Jordan suffered serious bodily injury as a result of that conduct when her vehicle was struck. She had several broken bones and a screwdriver was embedded in her leg. She suffered serious bodily injury as a result of that conduct.
>
> Specifically, . . . the State would show through witnesses that the [appellant's] speed in a construction zone was in excess of the speed limit which was posted at 55. His speed was determined to be between 64 and 65 based upon the Accident Reconstructionist for the State and the [appellant's] statement. That during the passage of this construction zone . . . he went through at least 29 signs indicating the speed, that workers were in a lane ahead, and that lane was closed. He remained in that lane when he struck Trooper Ross's vehicle from behind, causing Trooper Ross's vehicle to enter the median. It erupted in flames. Trooper Ross was killed by the flames in that vehicle.

The plea agreement provided that the appellant would receive a sentence of six years for the vehicular homicide conviction and two years for the aggravated assault conviction. The agreement also provided that the sentences would be served consecutively for a total effective sentence of eight years. Finally, the agreement stated, "Sentencing will be determined at a later date by The Court. However, the State agrees not to request more than one year of this time will be served. But the [appellant] obviously will be seeking a suspension of sentence and will be seeking probation."

Thereafter, the trial court held a sentencing hearing. Trooper Sam McCoy with the Tennessee Highway Patrol (THP) testified that on the morning of July 26, 2000, he witnessed an accident "[o]n I-40 in the eastbound lane near the 86-mile marker." That morning, he and Trooper Ross were performing traffic control for a construction crew that was cutting a "rumble strip" into the emergency lane of the interstate. Trooper McCoy noted that the westbound lanes of traffic were "flowing normally," while the eastbound lanes were slower due to the construction and the closure of the right lane of traffic. Trooper McCoy was stationed in the right lane behind the construction crew; specifically, he was parked behind an "arrow board" which was mounted on a pickup truck.

Trooper Ross was stationed in the right lane approximately one hundred yards behind Trooper McCoy.

Trooper McCoy stated that there were "numerous" signs indicating a lane closure and that the area was a construction zone. However, Trooper McCoy did not know the specific wording of the signs because the signs were placed behind him and he was not responsible for their placement.

Trooper McCoy stated that the construction crew had made progress for two miles that morning and "several thousand cars" had passed through the area without any trouble. Furthermore, Trooper McCoy opined that Trooper Ross' patrol car was visible from approximately one-half of a mile away. Shortly before 9:00 a.m., Trooper McCoy looked into his rear view mirror and observed the appellant's tractor-trailer collide with Trooper Ross' patrol car. Trooper McCoy noted that there was no tractor-trailer driving in front of the appellant. Specifically, Trooper McCoy explained that upon seeing the crash he immediately turned his patrol car around to go and help Trooper Ross; accordingly, his vehicle would have been "broadsided" if there had been another tractor-trailer in the left lane. Trooper McCoy was unaware of anyone narrowly missing Trooper Ross' patrol car that morning.

The next witness to testify was the second victim, Margaret Firn Jordan. Jordan testified that she was retired after twenty-eight years in law enforcement. On the morning of July 26, 2000, Jordan was driving in the left westbound lane of I-40. She stated that there were signs cautioning drivers to reduce their speed. Jordan began watching the construction and traffic in the eastbound lanes as well as the traffic in the westbound lanes. Jordan described the accident as follows:

> And then just all of a sudden, I saw this truck hit the rear end of the Trooper's car, and it exploded, and how it veered off into the median. And I just . . . didn't know what to think. You know, I –and at that time, it seemed like all traffic seemed to have slowed down considerably to probably 20 miles per hour.
>
> And I just kept watching this truck. And I thought, "My goodness. He's not even stopping. He's just" – the truck just seemed like it was just struggling to go forward, and then I saw it veering to the left – his left. And I was constantly calculating, you know, would he come across the median and hit me, or would he jackknife or whatever? So I just kept watching him. And it just seemed like all of a sudden my calculations were saying, "Hey, he's coming right at me." And I looked to the right. And of course, traffic was really congested. And so, I thought my only alternative was to jerk my truck to the left. And I did, and my right fender caught his back tandems. And that's . . . about it.

Jordan stated that during her years in law enforcement she had been trained to be observant; however, prior to the impact she did not see any vehicle narrowly miss striking Trooper Ross' patrol car.

Jordan testified that a screwdriver went through her left leg and one of her teeth was broken during the collision. Additionally, the top of Jordan's left leg was severely bruised and her right wrist was crushed. At the time of the sentencing hearing, Jordan continued to suffer from disability in her right arm and still bore "signs of a hematoma that was on [her] left leg." Jordan continued to have dental problems as a result of the accident. She stated that her medical problems caused a "tremendous financial strain." Additionally, Jordan noted that she had seen a counselor because the accident "had a very traumatic effect on me as far as driving on the interstate. I have to depend on my friends to take me places."

Jordan acknowledged that she had filed a civil lawsuit against the appellant and his employer. She further acknowledged that in her lawsuit she alleged that Dement Construction Company had inadequately marked the construction zone.

Trooper Ross' sister, Vernell Thomas, testified on behalf of Trooper Ross' family. She stated that the collision had a "devastating emotional effect on my family." In particular, Thomas noted that Trooper Ross' four children were suffering emotionally because they had been very close to their father.

Next, Trooper Barry Waldrop testified. Trooper Waldrop stated that he worked for the THP as the Team Leader for the Critical Incident Response Team. Trooper Waldrop stated that he was the "crash reconstructionist" for the collisions of July 26, 2000. Without objection, Trooper Waldrop was designated as an expert in accident reconstruction.

Trooper Waldrop noted that "there were probably in excess of twenty-nine signs" in the area surrounding the collision site. The signs consisted of "everything from speed limit signs to shoulder work signs to actual message boards." Additionally, some signs warned of a lane closure. In particular, Trooper Waldrop stated that there were eight speed limit signs, five message boards, and sixteen other construction zone signs. The message boards rotated the messages, "Use Caution," "One Lane Traffic Ahead," and "Workers in Road Ahead." Trooper Waldrop acknowledged that there were no signs specifically noting that the right lane would close. The signs began at the 74 mile marker and construction began between the 85 and 86 mile markers. Trooper Ross' patrol car was stationed near the 86 mile marker. Trooper Waldrop also noted that there were orange and white barrels placed in the median, indicating a construction zone. Trooper Waldrop opined that Trooper Ross' patrol car could have been seen from a distance of one-half of a mile away.

Trooper Waldrop stated that the speed limit in the construction zone was 55 miles per hour (mph). From his consideration of the appellant's statement to police shortly after the collisions and his examination of the scene, Trooper Waldrop determined that the appellant was driving no less than 64 mph at the time of the collision with Trooper Ross' patrol car. Trooper Waldrop stated that

the appellant had veered into the emergency lane and was attempting correction when he collided with Trooper Ross' patrol car. Specifically, Trooper Waldrop noted that the appellant's "path of travel would have put him off the highway onto the emergency strip approximately 100 feet. Anywhere from 50 to 100 feet prior to the collision, he was off the highway onto the shoulder of the highway." Trooper Waldrop explained that it was not unusual for drivers to stray into the emergency lane.

Trooper Waldrop explained that the appellant's tractor-trailer struck Trooper Ross' patrol car twice.

> The first time would be the initial impact where the – Trooper Ross's vehicle was stationary in the highway and the truck hit him. And the second time was after Trooper Ross was overrun and came out from underneath the tractor-trailer truck, and the truck entered the median with the patrol car. Then it was – he ran over him again, this time from the front because Trooper Ross's patrol car had rotated 180 degrees around. And this time, he was run over by the trailer of the tractor-trailer, specifically the left side of the Number 4 axle.

Trooper Waldrop explained that the second impact sealed Trooper Ross' vehicle and prevented his escape. The collision ruptured the trooper's gas tank and the fumes ignited, creating a fire. There was evidence that Trooper Ross applied his brakes after the flames erupted, indicating that Trooper Ross was alive at the time his vehicle caught fire.

Trooper Waldrop concluded that the evidence did not demonstrate another vehicle had swerved to avoid Trooper Ross' patrol car just before the appellant's collision with Trooper Ross. Regardless, Trooper Waldrop explained that a vehicle driving in front of the appellant would not have obstructed the appellant's view of Trooper Ross because the appellant "wasn't even on the roadway. He was off on the shoulder. He should have been able to see him." Trooper Waldrop maintained that the appellant did not apply his brakes until 1.8 seconds after impact. Trooper Waldrop explained that, considering a person's normal reaction time, this evidence indicated that the appellant did not see Trooper Ross until impact and at that point applied his brakes.

Without objection from the State, the defense submitted the affidavit of John C. Glennon. Glennon was a "Safety Consultant with John C. Glennon, Chartered – Automotive Technology and Traffic Engineering." Glennon "helped author the previous Manual on Uniform Traffic Control Devices." Glennon reviewed photographs of the scene of the collisions and the depositions of witnesses. Glennon stated, "Based on my experience and expertise, it is my opinion that the construction zone where the accident occurred in this case was made extremely dangerous to those working in the work zone as well as travelers on the highway by the completely improper markings set up to mark the construction zone."

Specifically, Glennon noted that there should have been signs indicating a closure of the right lane and a "lane closure taper" to gradually close the right lane. Additionally, Glennon stated that the arrow board was positioned too far away to help motorists notice Trooper Ross, and the message boards did not comply with federal regulations in that they flashed too many messages for a motorist to read.

The defense next submitted the affidavit of Scott Green. Green stated that he was driving a tractor-trailer in the right lane on I-40 east on the morning of July 26, 2000. He was driving directly in front of the appellant and there were two more tractor-trailers in front of Green. He estimated that all traffic was moving at 60 or 65 mph. As Green neared the 86 mile marker at approximately 8:45 a.m. that morning, he noticed the two tractor-trailers in front of him quickly swerve into the left lane. After the tractor-trailer directly in front of him swerved into the left lane, Green finally noticed Trooper Ross' patrol car parked in the right lane with its blue lights activated. Green quickly changed lanes and missed hitting Trooper Ross' patrol car by approximately one and one-half feet.

The defense also submitted the affidavit of Craig Treanor. At 8:30 or 9:00 a.m. on July 26, 2000, Treanor was traveling eastbound on I-40. Treanor stated that he was driving in the left lane at 70 or 75 mph. He claimed that he did not remember seeing any construction signs. Upon nearing exit 85, Treanor noticed Trooper Ross' patrol car in the right lane with its emergency lights activated. Treanor applied his brakes to ensure that he was no longer speeding. At first, Treanor believed that Trooper Ross was pursuing another vehicle; however, Treanor quickly "closed the gap" between himself and the trooper and realized that Trooper Ross' patrol car was parked in the right lane. The white car that had been driving in the right lane beside Treanor quickly swerved into the left lane in front of Treanor in order to avoid a collision with the trooper. Approximately 100 yards down the road, Treanor saw the construction crew and some arrow boards. Treanor asserted that there had been no prior indication that the right lane would be closed.

Next, the defense called Sharon Jones. Jones, a nurse, was driving home from work at 7:30 or 7:35 a.m. on I-40 east on the morning of July 26, 2000. She stated that she was driving the speed limit in deference to the construction zone. Jones saw two troopers stationed near the construction. At first, she thought the troopers were on the side of the highway; however, as she got closer she was "shocked" to discover that the troopers were parked in the right lane of the interstate. She acknowledged that she had ample time to get out of the way because she had a clear view of the troopers. Jones stated that she had planned to call the THP and report the dangerous conditions of the construction zone, but she became distracted upon arriving at home. Jones maintained that after she heard about the accident she made numerous telephone calls in order to contact defense counsel because she believed that "the roadblock was terrible. There was no warning."

The appellant testified on his own behalf at the sentencing hearing. The appellant explained that his home was in Caldwell, Idaho. The appellant stated that his three brothers, three sisters, and his mother also resided in Idaho. Since his graduation from high school, the appellant had held a variety of jobs. He served five years in the Army and received an honorable discharge. Following

his discharge, he spent four years in law enforcement before beginning his truck driving career in 1980.

The appellant stated that he had not driven a tractor-trailer since these offenses and would not drive a tractor-trailer again. The appellant explained that it was traumatic for him to look at a tractor-trailer. The appellant maintained, "I never wanted to hurt anybody."

The appellant acknowledged that after the collisions he had difficulty finding employment. Most employers were wary of his impending charges. Accordingly, he was unemployed at the time of the sentencing hearing. However, the appellant stated that he had two potential jobs in Idaho. The appellant testified that if he were granted probation, he had a job as a short-order cook, or he could work for Ron Sell trucking. The appellant explained that the job with the trucking company would not be as a driver.

The appellant stated that the July 26, 2000, collisions occurred on a Tuesday or Wednesday. On the preceding Thursday afternoon, the appellant had picked up a load in Long Beach, California, and was scheduled to deliver it to La Vergne, Tennessee. In the week prior to the offenses, the appellant never exceeded the number of hours he was supposed to drive, and he always took his mandated breaks. Additionally, the appellant kept his log books in accordance with regulations. He felt that he was getting an adequate amount of sleep, noting that he slept well the night before the collisions.

On July 25, 2000, the appellant spent the night at a truck stop in West Memphis, Arkansas. When the appellant woke at 6:30 or 6:45 a.m. on the morning of July 26, 2000, he went to the truck stop and bought a chocolate chip muffin, a hot dog, a twenty-ounce cup of coffee, and a bottle of water. The appellant left the truck stop and ate while driving. He stated that he did not feel tired, but he was still hungry after finishing the muffin, the hot dog, and the coffee.

The appellant testified that the day of the collisions was "the same old thing" as every other day. He stated:

> I still don't really remember much of the trip from there [the truck stop] other than I remember – I didn't know it was Exit 85, but I remember going past that exit and how the road turns to the right and goes up a little hill and – and then my next recollection was the Trooper was right in front of me.

The appellant maintained, "I think I tried to swerve . . . it's just really basically a blur." However, the appellant freely admitted that he struck Trooper Ross and Jordan.

The appellant testified that he cried when he discovered that Trooper Ross did not survive the collision. He explained that he did not get out of his tractor-trailer and attempt to help because "I couldn't just watch that car burn." The appellant stated that he saw a counselor after the collisions

because he "used to wake up screaming." Regardless, the appellant maintained, "it's the last thing I think about before I go to bed. It's the first thing that enters my mind when I wake up."

The appellant recalled that he was taken to the hospital after the collisions, accompanied by a trooper. He was treated for "bumps and bruises" and released. Upon his release, he went with the trooper to "a police headquarters." The trooper read the appellant his rights and asked the appellant to give a statement. The appellant did not request an attorney and voluntarily gave a statement to the trooper. During the statement, the appellant was repeatedly asked if he had fallen asleep prior to the accident. Initially, the appellant replied, "I don't know." However, he subsequently responded, "I can't discount the possibility that I fell asleep because I don't know." The appellant also did not remember if another vehicle was driving behind, beside, or in front of him.

On the day of trial, the appellant pled guilty to vehicular homicide by recklessness and aggravated assault with deadly weapon. The appellant stated that he pled guilty because "I just thought it was time for it to be over." He waited to plead because he was warring with his pride, explaining that he did not want to be a "convicted felon." However, he finally concluded that both he and Trooper Ross' family had been through enough.

The appellant stated that, including the instant offenses, he had been involved in only two accidents "in a truck" during his many years of commercial driving. The appellant acknowledged that he had received approximately five speeding tickets since he was seventeen years old. He had no prior criminal infractions. The appellant admitted that he was driving approximately 64 mph at the time of the collision with Trooper Ross, but he maintained that he was not aware that the speed limit in the construction zone was 55 mph until he was so informed after the collisions. The appellant conceded that the cruise control on his tractor-trailer was set at 65 mph, and he did not reduce his speed even though he knew he was in a construction zone.

The appellant admitted that the other wreck in which he was involved had occurred three years before the instant collisions. In the earlier collision, the appellant "hit two Utah State police officers that were parked in the middle of the road on a freeway in one of the suburbs of Salt Lake City." The appellant stated that because he did not know the cause of the wreck, he went to see a doctor. Ultimately, the appellant was diagnosed with severe sleep apnea which required surgery. The appellant stated that he felt better immediately after surgery. The appellant testified that he attended a follow-up appointment with his doctor two weeks after surgery. He maintained that he was never told that he could not drive a tractor-trailer.

The appellant stated that in August 1999 he had "a physical to drive a truck." The appellant saw Dr. Shockley in Ownesboro, Kentucky. The appellant did not tell Dr. Shockley that he had been previously diagnosed with sleep apnea because he believed that the condition had been corrected by surgery.

The appellant admitted that in the Fall of 1999, he told his dispatcher, Brian Haynes, that he was feeling "fatigued and tired." The appellant stated that Haynes asked the appellant if he should

see a doctor. The appellant stated that he saw a doctor and was told "I had the flu or something." The appellant maintained that he was not fatigued on the morning of the collisions because he had rested well the previous night.

The next witness to testify was Brian Haynes, the appellant's dispatcher at the time of the offenses. Haynes asserted that the appellant was a very good employee and never made late deliveries or committed safety violations. Haynes stated that the appellant could have been considered a "slow driver" because he drove his allotted hours and took his mandatory breaks, then he would quit for the day.

Haynes spoke with the appellant shortly after the collisions and described the appellant as "very distraught, very upset, crying." The appellant told Haynes that he did not remember how the collisions occurred.

Haynes acknowledged that the appellant had previously complained of fatigue. Haynes suggested to the appellant that he seek medical attention. The appellant never mentioned the problem again and Haynes did not question the appellant about it. Haynes stated that he did not report the appellant's complaints of fatigue to a supervisor because "[i]t comes with the job."

Tom Doherty, pastor of Cloverdale Church of God in Boise, Idaho, testified that he had known the appellant for thirty-eight years. He stated that the collisions were "devastating" to the appellant because he's "a very sensitive fellow." The appellant became depressed after the collisions and felt particularly remorseful towards Trooper Ross' children. Doherty opined that the appellant had good potential for rehabilitation.

James A. Vish, another long-time friend of the appellant, also testified on the appellant's behalf. Vish resided in Homedale, Idaho, and is the Deputy Sheriff in Owyhee County, Idaho. Vish stated that he had previously ridden in a tractor-trailer with the appellant and would "drive with him anywhere." Vish opined that the appellant was not a lawbreaker or a risktaker. Vish stated that "alcohol and drugs were never a factor in [the appellant's] life." Vish feared that the appellant would commit suicide after the collisions because he was unable to handle the guilt.

Finally, the defense presented the appellant's younger brother, Scott Engum. Engum stated that the appellant's family was very close. He indicated that the appellant was proud of his service in law enforcement. Engum related that the appellant was devastated by the collisions and was depressed by "the loss he has caused for the Ross family." Engum opined that the appellant never wished to hurt anyone and had always desired to "do right by the law."

In rebuttal, the State called Charles Ruby. Ruby stated that he entered I-40 east at exit 85 on the morning of the collisions. Ruby stated that he had difficulty merging with traffic because two approaching tractor-trailers were driving in the right lane. The lead tractor-trailer, which was driven by the appellant, did not change lanes to allow Ruby to enter the highway. However, the second tractor-trailer allowed Ruby to enter the flow of traffic. After Ruby merged onto the interstate, the

second tractor-trailer swerved back into the right lane in front of Ruby. Once on the interstate, Ruby set his cruise control for 57 mph because he knew police frequently ticketed speeders in the construction zone. The tractor-trailer following the appellant appeared to be proceeding at the same speed as Ruby, but the appellant "pull[ed] away from us."

Ruby, who was traveling behind the second tractor-trailer, saw the appellant swerving into the emergency lane. Ruby saw two separate "cloud[s] of dust" near the emergency lane where the appellant was driving. Ruby opined that the dust clouds were caused by the appellant repeatedly veering into the emergency lane. Ruby thought that the appellant must have dropped a cigarette or fallen asleep. Immediately after the appellant swerved a second time, Ruby and the second tractor-trailer reduced their speed. Ruby recalled, "Then there was a fireball, and Trooper Ross was killed."

Ruby stated that he would have seen another vehicle traveling in front of the appellant and there was no such vehicle. Additionally, Ruby maintained that he never saw any other vehicle take "evasive action" around the area where Trooper Ross was stationed.

Next, the State called Allan Wainscott. Wainscott testified that he had been involved in the trucking industry for over twenty years. He entered I-40 westbound at exit 87 on the morning of July 26, 2000. Wainscott stated that traffic was moving "fairly slow" and that he was driving 55 mph because his wife had been recently ticketed for driving 60 mph in the construction zone.

Wainscott's attention was drawn to the eastbound lanes of I-40 by a flash of light. He saw Trooper Ross' vehicle parked in the right lane with its blue lights activated. Recalling the collisions, Wainscott testified:

> Upon impact at that time, the truck hit the car. I saw a ball of fire go underneath the truck. I noticed that the front wheel – the left front steer tire of the truck stopped turning. It was up on top of the car. And as it moved forward, I noticed the tire started turning again and the vehicle came towards the median strip towards where I was passing by.

Wainscott stated that he did not see any other tractor-trailer come by Trooper Ross and have to take evasive action.

After the conclusion of the testimony, the trial court noted that the length of the sentences had been agreed upon. Therefore, the trial court noted that "[i]t's really a question of whether or not any jail time should be imposed in this case." The trial court observed that the State had only requested one year of confinement. The trial court ultimately determined that the appellant should receive a period of incarceration due to the seriousness of the offenses and the effect of deterrence on the appellant and the community. Accordingly, the trial court ordered the appellant to serve eight months of his six-year sentence for the vehicular homicide conviction in confinement and four months of his two-year sentence for the aggravated assault conviction in confinement. In accordance

with the plea agreement, the sentences were to be served consecutively. Thus, the court imposed a total effective sentence of eight years, with one year to be served in confinement. Additionally, the trial court determined that the appellant's driving privileges should be suspended for eight years. The appellant timely appealed the trial court's rulings and raised the following issues for our review:

> (1) "[w]hether the Trial Court failed to apply the Sentencing Guidelines properly when it did not begin its sentencing consideration with the presumption that a sentence other than incarceration would result in the [appellant's] successful rehabilitation";

> (2) whether the trial court improperly denied the appellant full probation;

> (3) whether the trial court improperly applied and weighed various enhancement and mitigating factors; and

> (4) whether the trial court erred in suspending the appellant's driving privileges in all states for eight years.

## II. Analysis

### A. Denial of Full Probation

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d) (1997). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. See Tenn. Code Ann. § 40-35-102, -103, -210 (1997 and 2003); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence(s). See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169. We conclude that the trial court's determinations are eligible for the presumption of correctness.

### 1. Presumption in Favor of Alternative Sentencing

Initially, we recognize that an appellant is eligible for alternative sentencing if the sentence actually imposed is eight years or less. See Tenn. Code Ann. § 40-35-303(a) (1997). Moreover, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony

is presumed to be a favorable candidate for alternative sentencing. See Tenn. Code Ann. § 40-35-102(6). In the instant case, the appellant is a standard Range I offender convicted of a Class C felony (vehicular homicide by recklessness) and a Class D felony (aggravated assault with a deadly weapon); therefore, he is presumed to be a favorable candidate for alternative sentencing. See Tenn. Code Ann. §§ 39-13-102(a)(2) and (d)(1), -213(a)(1) and (b) (1997 and 2003). However, this presumption may be rebutted by "evidence to the contrary." State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). The following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), may constitute "evidence to the contrary":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Zeolia, 928 S.W.2d at 461.

The trial court began its sentencing of the appellant by noting that as part of the plea agreement that the State recommended that the appellant receive only one year of his eight year sentence in confinement. The trial court approved this sentencing recommendation and stated that "the only issue really left for discussion . . . is whether any period of confinement up to one year should or should not be imposed." In other words, the trial court was to determine whether the appellant should receive the alternative sentence of split confinement, namely one year of confinement followed by seven years of probation, or full probation. See Tenn. Code Ann. §§ 40-35-104(c)(5) and 40-35-306(a) (1997 and 2003). Therefore, while the trial court never specifically stated that the appellant was presumed to be a favorable candidate for alternative sentencing, the appellant nevertheless implicitly received the benefit of the presumption by the trial court determining at the outset that the appellant would receive either partial or full probation.

The trial court noted that "the burden is really upon the [appellant] to show that [he] is, in fact, a proper candidate . . . for full probation." The appellant vehemently argues that "the Trial Court was required to begin its sentence consideration with the presumption that [the appellant] was a favorable candidate for full probation." We disagree.

The law is clear that a qualified offender is entitled to a presumption in favor of *alternative sentencing*. However, it is well-settled that an appellant seeking *full probation* bears the burden of establishing his suitability for full probation, regardless of whether he is entitled to the statutory presumption favoring alternative sentencing. See State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996); see also Tenn. Code Ann. § 40-35-303(b) (1997). To prove his suitability, the appellant

must establish that granting full probation will "'subserve the ends of justice and the best interest of both the public and the [appellant].'" State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 8 (Tenn. 2000). Moreover,

> [i]n determining one's suitability for full probation, the court may consider the circumstances of the offense, the defendant's potential or lack of potential for rehabilitation, whether full probation will unduly depreciate the seriousness of the offense, and whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes.

Boggs, 932 S.W.2d at 477. Thus, the trial court correctly determined that although the appellant would receive the alternative sentence of split confinement, he would nonetheless bear the burden of establishing his suitability for the largess of full probation.

Finding that the appellant should serve one year of his sentence in confinement, the trial court stated that to grant the appellant full probation would depreciate the seriousness of the offenses and that a period of incarceration would have a deterrent effect upon the appellant and others likely to commit similar offenses. We will first address the trial court's findings regarding the seriousness of the offenses.

## 2. Depreciating the Seriousness of the Offenses

In denying full probation to avoid depreciating the seriousness of an offense, this court should determine if the criminal act is especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree. See Zeolia, 928 S.W.2d at 462. The appellant argues that he "could not have fallen asleep or been inattentive to the road for more than a matter of seconds." Thus, he contends that such inattention could not have merited a denial of full probation based upon the seriousness of the offenses.

The trial court, as the finder of fact, stated:

> I do want to point out based upon the testimony that's been presented that this incident was a very violent, very horrible incident that occurred. . . . I say that because of the fact that it was testified that it was almost two seconds after the impact before [the appellant] ever applied his brakes. . . .
>
> Now, what that tells me is this. You've got a State Trooper. You've got an individual seated there in a parked car. You've got a tractor-trailer rig that's coming down the interstate at 65 miles per hour that runs right smack into the back of this stationary vehicle. Now, you've got to think about that for a minute. The ramifications are just

-13-

– are terrific. They're horrible. The testimony was that after this vehicle was struck that it was drug several hundred feet, that this tractor-trailer rig that [the appellant] was driving ran or turned off into the median strip, that the vehicle – that the patrol car was underneath the vehicle. At some point, the vehicle flipped over and the tractor-trailer rig – the trailer part itself went directly over the top of this vehicle, that this vehicle lay upside down in the median area with this Officer trapped, not able to get out, and it burst into flames. The Officer died a very violent death out there that day – all as a result of [the appellant's] carelessness and his recklessness, speeding, failing to maintain control, failing to maintain a proper lookout. This incident could have very easily been avoided had [the appellant] been following the rules of the road, but he chose not to.

Also, you look at the danger that Ms. Jordan – the damage that she received. She's on the complete opposite side of the interstate going a totally opposite direction. And all of a sudden, here she's faced with this eighteen-wheeler barreling down upon her. She tried to take some evasive action, and it may have, in fact, saved her life. I don't know. But her vehicle was certainly struck. She was severely injured. She had a tooth knocked out and broken. She had an arm permanently injured. A wrist that was damaged – a right wrist and right arm. She also testified about a screwdriver being lodged in her leg. These are all very serious injuries that could have very easily been avoided under the circumstances. This is not as some have referred to it as an accident. This was, in fact, an avoidable accident.

Based upon the trial court's factual findings we conclude that the instant offenses were especially violent, shocking, and horrifying and merited a denial of full probation based upon the seriousness of the offenses. Regardless of the application of this consideration, the trial court also denied the appellant full probation based upon the deterrent effect of incarceration.

### 3. Deterrence

In State v. Hooper, 29 S.W.3d 1, 10-12 (Tenn. 2000), our supreme court specifically noted five factors for consideration when denying probation solely upon the basis of deterrence:

(1) Whether other incidents of the charged offense are increasingly present in the community, jurisdiction, or in the state as a whole.
. . . .
(2) Whether the defendant's crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from the criminal behavior.

-14-

. . . .
(3) Whether the defendant's crime and conviction have received substantial publicity beyond that normally expected in the typical case.
. . . .
(4) Whether the defendant was a member of a criminal enterprise, or substantially encouraged or assisted others in achieving the criminal objective.
. . . .
(5) Whether the defendant has previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions.

Of course, this list of factors is not exhaustive; "[a]dditional factors may be considered by the sentencing court, provided that (1) the sentencing court states these additional factors on the record with some specificity, and (2) the presence of these additional factors is supported by at least some proof." Hooper, 29 S.W.3d at 12.

According to the facts upon which the appellant's pleas were based, the instant offenses were the result of reckless behavior. Our supreme court has explained that "[a]ctions that are the result of . . . reckless behavior . . . are probably more deterrable than those which are not the result of a conscious effort to break the law." Id. at 11. In the instant case, the trial court was particularly concerned about deterring the reckless conduct of those persons who speed through construction zones, thereby endangering the lives of others.

Additionally, the trial court noted that the appellant's case "has received a lot of news coverage." The record reflects that the appellant's case was highly publicized. Notably, prior to trial the defense moved for a change of venue because of the publicity involving the case and submitted numerous newspaper articles as evidence of the publicity. Moreover, at least two witnesses at the sentencing hearing mentioned hearing news reports of the collisions.

Finally, we note that the appellant "has previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions." The Hooper court observed:

Repeated occurrences of the same type of criminal conduct by a defendant generally warrant a more emphatic reminder that criminal actions carry consequences. Although the statute speaks in terms of general deterrence, it has been recognized that general deterrence is possible only after specific deterrence has first been achieved.

Id. at 12.

-15-

At the sentencing hearing, the appellant admitted that three years prior to the instant offenses, he was involved in a similar collision with two Utah officers who were stationed on a roadway. Like the instant offenses, the appellant could not explain how the collision happened or recall the events leading up to the collision. In his statement to THP troopers following the instant offenses, the appellant acknowledged that he was "charged with careless driving" after the prior incident. Accordingly, we conclude that the record demonstrates a need for specific deterrence. Furthermore, the existence of the three foregoing factors support the trial court's denial of full probation based upon deterrence.

### 4. Enhancement and Mitigating Factors

The appellant also complains about the trial court's determination regarding the application of enhancement and mitigating factors.[1] Tennessee Code Annotated section 40-35-210(b)(5) (1997 and 2003) provides that the trial court should consider enhancement and mitigating factors, among other factors, in determining "the specific sentence and the appropriate combination of sentencing alternatives that shall be imposed on the [appellant]." Moreover, in connection with alternative sentencing, "[a] court may also apply the mitigating and enhancing factors set forth in Tennessee Code Annotated sections 40-35-113 and -114 as they are relevant to the section 40-35-103 considerations." State v. Housewright, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997).

The trial court found the existence of the following enhancement factors:[2]

> (1) The appellant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

> (6) The amount of damage to property sustained by or taken from the victim was particularly great; and

> (10) The appellant had no hesitation about committing a crime when the risk to human life was high.

See Tenn. Code Ann. § 40-35-114(1), (6), and (10) (1997). The appellant disputes the application of each of these enhancement factors. We will address each of these in turn.

---

[1] We again note that the length of the appellant's sentences was stipulated in the plea agreement, which agreement was approved by the trial court. Accordingly, we now address the enhancement and mitigating factors in relation to their relevance to the trial court's denial of full probation.

[2] As of July 4, 2002, the statutory enhancement factors have been renumbered. See Tenn. Code Ann. § 40-35-114 (2003). However, in the instant case, we will use the numbering of the 1997 version of Tennessee Code Annotated section 40-35-114.

The trial court applied enhancement factor (1) because of the appellant's history of "five separate speeding tickets which he admitted to that he had received since the time he was seventeen years of age." The court noted that "[a]lthough they're not necessarily the normal type of criminal convictions that we normally see, they are criminal in nature. They are certainly criminal behavior. Exceeding the speed limit is a criminal act in this state as in all states. So that's something The Court can consider." The trial court further noted that enhancement factor (1) should be afforded moderate weight because the instant offenses "involve speeding."

This court has recently observed:

> [W]e are reluctant to find that a single speeding ticket constitutes criminal behavior so as to permit enhancement of [a] sentence. The goal of individualized sentencing and fashioning a sentence to fit the offender would be lost if the speeding defendant, which would be virtually every defendant, would be placed on equal status with the convicted felon upon application of enhancement factor [(1)].

State v. Brenda F. Jones, No. W2002-00751-CCA-R3-CD, 2003 WL 21756681, at *4 (Tenn. Crim. App. at Jackson, July 29, 2003). In the instant case, the fifty-two-year old appellant had received five speeding tickets since the age of seventeen, three of which he had received since 1980 when he began his career as a commercial truck driver. Even if enhancement factor (1) were applicable to the appellant, we conclude that the factor was entitled to little, if any, weight. See State v. Marsha L. McClellan, No. E2000-02373-CCA-R3-CD, 2001 WL 394849, at *6 (Tenn. Crim. App. at Knoxville, Apr. 19, 2001).

The trial court next found the existence of enhancement factor (6), "[t]he personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great." Tenn. Code Ann. § 40-35-114(6) (1997). The trial court correctly observed that it could not apply the factor based upon Trooper Ross' death or Jordan's injuries as such injuries were elements of the offenses for which the appellant was convicted. See Tenn. Code Ann. § 40-35-114 (1997) (stating that enhancement factors may be applied "if not themselves essential elements of the offense as charged in the indictment"). However, the trial court applied this factor to both offenses because both Trooper Ross' patrol car and Jordan's vehicle were totally destroyed. The appellant claims that Trooper Ross suffered no property damage because he did not personally own the patrol car he was driving; instead, the patrol car was owned by the THP. Additionally, the appellant complains that the record contains no evidence as to the amount of damage suffered by Jordan.

Upon our review of the record, we conclude that the trial court properly applied this enhancement factor to both offenses. First, we observe that while the appellant is correct that Trooper Ross did not personally own the patrol car in which he was killed, we believe that the spirit of this enhancement factor is satisfied because Trooper Ross was acting in his professional capacity as an agent of the State, the owner of the patrol car, at the time of the collision. Moreover, while the

appellant is correct in stating that Jordan never testified regarding the specific monetary damage to her vehicle, the presentence report reflects that her vehicle was "totally destroyed." Additionally, we conclude that the photographs of her demolished vehicle and of the decimated patrol car provide sufficient proof that the damage sustained by the victims was particularly great.

Additionally, the appellant complains that "[v]ehicles are totaled in accidents all of the time. There is nothing particularly great about this type of property damage." However, this court has previously noted that "vehicular homicide does not require that the victim be driving a vehicle or that a victim be a passenger in a vehicle." State v. Russell E. Mills, No. M1999-02505-CCA-R3-CD, 2000 WL 1336685, at *5 (Tenn. Crim. App. at Nashville, Sept. 15, 2000). Likewise, aggravated assault does not necessarily entail damage to a vehicle. Moreover, this court has repeatedly approved the application of this enhancement factor in cases where there was proof that the vehicle involved in a collision was destroyed. See id.; see also State v. Robbie R. Bailey, No. E2001-00210-CCA-R3-CD, 2001 WL 1516956, at *5 (Tenn. Crim. App. at Knoxville, Nov. 29, 2001); State v. George Blake Kelly, No. 01C01-9610-CC-0048, 1998 WL 712268, at *12 (Tenn. Crim. App. at Nashville, Oct. 13, 1998).

Finally, the trial court applied enhancement factor (10), finding that the appellant "had no hesitation about committing a crime when the risk to human life was high." Tenn. Code Ann. § 40-35-114(10) (1997). As charged in the indictments, this enhancement factor would be considered an element of both vehicular homicide and aggravated assault. See State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995) (observing that "there is necessarily a high risk to human life and the great potential for bodily injury whenever a deadly weapon is used" as it is in aggravated assault with a deadly weapon); State v. Bingham, 910 S.W.2d 448, 453 (Tenn. Crim. App. 1995) (explaining that "if there is no risk to the life of a person other than the victim, clearly the proof necessary to establish enhancement factor (10) will be encompassed by the proof necessary to establish an essential element of vehicular homicide"), overruled on other grounds by State v. Hooper, 29 S.W.3d 1 (Tenn. 2000).

However, our law is clear that enhancement factor (10) may be applicable to vehicular homicide or aggravated assault if "there is a risk of harm to a person other than the victim." State v. Zonge, 973 S.W.2d 250, 259 (Tenn. Crim. App. 1997). In the instant case, the trial court specifically found that Trooper McCoy, the construction crew, and westbound motorists were endangered by the appellant's actions. The appellant argues that "Trooper McCoy's life was never in danger as a result of [his] conduct." Additionally, the appellant disputes that the construction crew was endangered and contends that "[t]here is no evidence in the Record that any car other than [Jordan] was actually in harm's way in the westbound lanes."

Trooper McCoy testified that at the time of the appellant's collision with Trooper Ross, he was stationed a scant 100 yards away from Trooper Ross. The construction crew was working nearby, although the exact distance is not reflected in the record. Additionally, Ruby testified that he was driving only a short distance behind the appellant and saw Trooper Ross' patrol car burst into flames. Also, Jordan testified that she had to swerve left to attempt to evade the appellant because

"traffic was really congested." Finally, Wainscott, who was traveling in the westbound lanes of I-40, testified that before the appellant's collision with Jordan, he observed that the appellant's "vehicle came towards the median strip towards where I was passing by." We conclude that the trial court did not err in applying the enhancement factor (10) to both of the appellant's convictions. See Bingham, 910 S.W.2d at 453; State v. Robert S. Neal, No. M2001-00441-CCA-R3-CD, 2002 WL 31852854, at *24 (Tenn. Crim. App. at Nashville, Dec. 19, 2002), perm. to appeal denied, (Tenn. 2003).

The appellant next complains that the trial court erred in failing to consider the following mitigating factors under Tennessee Code Annotated section 40-35-113(13) (1997 and 2003), the "catch-all" provision of the statute:

> (1) the appellant's lack of criminal history;
>
> (2) the appellant was not under the influence of drugs or alcohol;
>
> (3) the appellant "did not believe he suffered an illness that would impair his ability to drive";
>
> (4) the appellant's "log books for the five day trip were in complete compliance with federal regulations";
>
> (5) the appellant "never drove beyond the number of hours allowed by law";
>
> (6) the appellant "had seven hours sleep the night before the accident"; and
>
> (7) "the construction zone was improperly marked and actually created a hazard for motorists."

As for the appellant's lack of criminal history, this court has previously explained that "[a]lthough absence of a prior criminal record may be considered under the catch-all provision of Tennessee Code Annotated section 40-35-113(13) . . . this court is not required to consider this as a mitigating factor." State v. Williams, 920 S.W.2d 247, 261 (Tenn. Crim. App. 1995). This is because "every citizen is expected to refrain from committing any type of crime." State v. Clayton Eugene Turner, II, No. 03C01-9805-CR-00176, 1999 WL 817690, at *16 (Tenn. Crim. App. at Knoxville, Oct. 6, 1999). Correspondingly, we conclude that each citizen has a duty to follow the law; therefore, the trial court was under no obligation to consider the appellant's proposed mitigating factors 2, 4, and 5. Therefore, we decline to hold that the trial court's failure to apply these mitigating factors was error.

Furthermore, as to the appellant's proposed mitigating factor 6, that he slept seven hours the night before the collision, the trial court stated that "I'm still not sure how it really is mitigating under the circumstances." While much of the sentencing hearing was devoted to the appellant's sleeping habits, the trial court focused primarily on the appellant's speed and his inattention to his driving, especially while driving in a construction zone. There is no indication in the record that the amount of sleep the appellant received the night before the collisions positively or negatively affected events. Accordingly, we conclude that the trial court correctly found that the appellant's sleeping habits should not be considered as a mitigating factor.

Moreover, the trial court refused to consider as a mitigating factor that the appellant "did not believe he suffered an illness that would impair his ability to drive", observing that

> although he did have surgery [to correct his sleep apnea], . . . he never followed through with it after that. He never went back for any additional treatment or surgeries although it was being recommended by his physician that he should.

Based upon this reasoning, we conclude that the trial court did not err in refusing to mitigate the appellant's sentence on this basis.

As to the appellant's complaints regarding the construction zone, the trial court stated, "Nor do I find that this construction zone was not properly marked. As a matter of fact, I find to the contrary concerning this construction zone. The Court is convinced by at least a preponderance of the evidence that this construction zone was clearly marked as a construction zone." Generally, this court does not set aside the factual findings made by the trial court after a sentencing hearing unless the evidence preponderates against such findings. See Zeolia, 928 S.W.2d at 462; State v. Raines, 882 S.W.2d 376, 383 (Tenn. Crim. App. 1994). We conclude that the evidence does not preponderate against the trial court's findings in relation to this issue. Accordingly, the trial court did not err in refusing to apply this mitigating factor.

The appellant also complains regarding the weight afforded certain enhancement and mitigating factors. However, "[t]he weight given to each factor is within the trial court's discretion provided that the record supports its findings and it complies with the Sentencing Act." State v. Carter, 908 S.W.2d 410, 412 (Tenn. Crim. App. 1995); see also State v. Boggs, 932 S.W.2d 467, 475-76 (Tenn. Crim. App. 1996). As we noted, the trial court erred in attributing moderate weight to enhancement factor (1). However, we conclude that the trial court did not abuse its discretion in the weight attributed to the remaining enhancement or mitigating factors. See State v. Winfield, 23 S.W.3d 279, 284 (Tenn. 2000) (finding that the misapplication of an enhancement factor does not necessarily result in the reduction of a defendant's sentence).

B. Suspension of Driving Privileges

Finally, the appellant complains that the trial court erred when it suspended his driving privileges in all states for eight years. Specifically, the appellant argues that "according to the [applicable] statute the Trial Court must prohibit [the appellant] from driving a vehicle in the state of Tennessee for a minimum of three years, not the state of Idaho. The Trial Court's order prohibiting [the appellant] from driving in any state for the next eight years is not supported by law."

Tennessee Code Annotated section 39-13-213(c) (1997 and 2003) provides that the trial court "shall prohibit a defendant convicted of vehicular homicide from driving a vehicle in this state for a period of time not less than three (3) years nor more than ten (10) years." The trial court noted that "the law does require a mandatory period of revocation of three years, and he could receive a maximum period of revocation of ten years." While the trial court did not specifically cite this statute in revoking the appellant's driver's license, the trial court's language clearly reveals that the court was referencing this statute and was not revoking the appellant's license as part of his probation.

The trial court stated:

> Mr. Engum, I do want to advise you, you are prohibited from driving any motor vehicle for at least the next eight years or until you've received – your driving privileges are reinstated by this Court. But that's going to be at least eight years from today. Okay?
>
> You cannot be driving a motor vehicle. All right. Your license will be sent to the Department of Safety. And, of course, that revocation applies to all states. You cannot be driving or receiving any driver's license in any state. Okay?

Generally, our courts glean "a statute's purpose from the plain and ordinary meaning of its language 'without forced or subtle construction that would limit or extend the meaning of the language.'" State v. Owens, 20 S.W.3d 634, 640 (Tenn. 2000) (quoting Carson Creek Vacation Resorts, Inc. v. State Dep't of Revenue, 865 S.W.2d 1, 2 (Tenn. 1993)) (footnote omitted). In other words,"[w]hen statutory language is plain and unambiguous, [courts] must not apply a construction apart from the words of the statute." State v. Nelson, 23 S.W.3d 270, 271 (Tenn. 2000). The clear language of Tennessee Code Annotated section 39-13-213(c) provides that the trial court has the authority to revoke the appellant's driving privileges *in this state.* Ergo, the trial court exceeded the boundaries of the statute by revoking the appellant's driving privileges *in all states.*[3] However, we

---

[3] Notably, Tennessee Code Annotated section 55-50-203(e)(3) (Supp. 2002) provides:

> The department [of safety] is further authorized, upon receiving a record of the conviction in this state of a nonresident driver of a motor vehicle of any offense under the motor vehicle laws of this state, to forward a certified copy of such record to the motor vehicle administrator in the state wherein the person so convicted is a

(continued...)

conclude that the trial court did not abuse its discretion in revoking the appellant's driving privileges in Tennessee for a period of eight years. Therefore, we remand to the trial court for correction of the judgment on vehicular homicide conviction. The corrected judgment shall reflect that the appellant's driving privileges are revoked in this state for a period of eight years.

### III. Conclusion

Accordingly, the judgments of the trial court trial court are affirmed except as set forth herein.

_____
NORMA McGEE OGLE, JUDGE

---

[3](...continued)
    resident.